# IN THE COURT OF APPEALS OF IOWA

No. 24-2084
Filed April 9, 2025

**IN THE INTEREST OF N.G., J.W., A.W., A.W., L.W., and C.W.,**
**Minor Children,**

**A.W., Mother,**
 Appellant,

**A.W., Father,**
 Appellant.
_____

Appeal from the Iowa District Court for Floyd County, Elizabeth Batey, Judge.

A mother and father separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Elizabeth M. Wayne of Papenheim Law Office, Parkersburg, for appellant mother.

Ann M. Troge, Charles City, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Danielle M. Ellingson of Noah, Smith, Sloter & Ellingson, P.L.C., Charles City, attorney and guardian ad litem for minor children.

Considered without oral argument by Ahlers, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

There are six children at issue in this blended family,[1] ranging in age from thirteen years old to eighteen months old. The father of the five youngest children is best described as indifferent, leaving much of the parenting to the mother. But because of an intellectual disability, she is overwhelmed by caring for just one of her children, let alone all six. After close to two years of services, the case manager for the Iowa Department of Health and Human Services testified, "short of me moving in with the family, I don't know what more the Department can do."

The juvenile court terminated the parents' rights under Iowa Code section 232.116(1)(f) and (h) (2024).[2] The mother and father separately appeal, challenging each of the three steps in our termination analysis. We affirm upon our de novo review of the record.

I.     **Background Facts and Proceedings**

In the past ten years, the Iowa Department of Health and Human Services has conducted nineteen assessments of this family. The most recent was in January 2023, before the youngest child was born. While investigating that report, which included an allegation that the father was smoking marijuana while caring for the children, the department became concerned by the condition of the family's home. It was "covered in trash, clothing, and empty food containers," with portions of the home impassable and exits blocked. When the father was asked about the

---

[1] A seventh child, the mother's now fifteen-year-old daughter, was allowed to remain in her mother's custody and is not involved in this appeal.
[2] The court also terminated the parental rights of the father of the oldest child. Because that father has not appealed, our references to "the father" throughout the rest of this opinion means the father of the five other children.

substance-use allegation, he admitted that he regularly smoked marijuana in the garage. The report was founded for failure to provide adequate shelter and supervision for the children.

The juvenile court adjudicated the children in need of the court's assistance in March. Professionals from the department worked with the family to clean the home, but the parents had difficulty maintaining its condition even with that assistance. The children remained in the parents' custody under the department's protective supervision until August, when the department received multiple reports about the children being left unsupervised. One of them was from a neighbor, who said the parents' two-year-old child was in the neighbor's back yard wearing only a diaper. The department received another report that the seven-year-old child was found swimming alone in the Cedar River. A week later, three of the children left the home on their own for more than two hours, and the parents did not know they were gone. While investigating these reports, the department visited the home and found it was unsafe, cluttered, and dirty again.

After these reports, the juvenile court removed the children from the parents' custody. The youngest child was born the next month and allowed to remain with the parents. By December, the mother was participating in weekly individual therapy sessions and had started couples' counseling with the father, who was on probation for assaulting her the year before. The condition of the home had also improved. But the father was not participating in any mental-health or substance-use treatment, even though it was recommended by his evaluations. The case manager for the department reported that the father "is clearly not making a concerted effort and further does not believe he has changes to make," although

his drug screens were negative.  But because the mother had been "making positive changes and strides in all areas to have the children returned home," the parents began semi-supervised visits.  This did not go well.

In mid-January 2024, the oldest of the six children tried to harm himself at a visit.  He was twelve years old at the time.  A video taken by one of the other children showed the father laughing at the child, rather than trying to defuse the situation.  The child, who suffers from several mental-health diagnoses,[3] told the case manager that he did not feel safe at visits unless they were supervised.  The second oldest child, who was eight years old, is diagnosed with autism, selective mutism, ADHD, and unspecified disruptive impulse-control and conduct disorder.  He can be physically aggressive and often elopes from home.  The third oldest child, a six-year-old boy, also has ADHD and generalized anxiety disorder.  After the semi-supervised visits began, all of the children's behavior worsened.  Conditions in the home had also deteriorated again.

Despite these discouraging developments, the department began a trial home placement for the second and third oldest children.  The infant was also allowed to remain in the parents' custody.  But the parents' interactions with the oldest child and two of his younger siblings returned to fully supervised.  Safety concerns quickly arose even during those supervised visits.  On one visit, the two-year-old child was playing with a butter knife that he found on the floor, and he put a rock in a hot toaster.  A worker supervising the visit intervened both times.  On

---

[3] Those diagnoses include disruptive mood dysregulation disorder, mixed receptive-expressive language disorder, and attention deficit hyperactivity disorder (ADHD).

another visit, the second oldest child found two pocketknives and was running around with them.  At a different visit, the two oldest children found marijuana and drug paraphernalia in the garage.  During these visits, which providers described as loud and chaotic, the father was "either not paying attention, attending to his own wants, or reverting to verbal aggression such as yelling."  There were also times when he pretended to sleep or just ignored requests for him to help parent.  The mother was simply overwhelmed and unable to supervise more than one child at a time.  A parenting evaluation found that although the mother "had an intellectual disability, her adaptive functioning given her mental health was much lower."  The evaluation concluded the mother "appeared to need many supports in order to be able to live outside of a higher level of care, and should not be left unsupervised with minors or dependents."

In April, the department ended the trial home placement and removed the infant from the parents' custody after their eight-year-old child was found by himself at a fast-food restaurant about two miles away from his home around 11:00 p.m. The child had walked there in his pajamas without the parents knowing he had left, even though he had to walk past their bedroom to get out of the house.  It was unclear whether locks the department had helped the parents install on the back door were engaged.  When the case manager and a child protective worker visited the home the next day, they saw that it was extremely cluttered and unsanitary again, with no safe place for the infant to sleep.  After the removal, the State petitioned to have the youngest child adjudicated in need of assistance, which the court granted in May.

The parents made no progress over the summer. The oldest child stopped attending visits at his therapist's recommendation. The visits with the other children had to be supervised by two providers to keep the children safe. The mother continued to struggle with parenting more than one child, often needing direction from the providers. Rather than helping the mother, the father "put parenting, cleaning, cooking, and household management" on her and then belittled her ability to complete those tasks.

With this lack of progress, the juvenile court directed the State to file a petition to terminate the parents' rights. About two weeks before the hearing in October, the parents were evicted from their home for nonpayment of rent. They moved to a motel, with "no solid plan" for finding stable housing. The parents had submitted several housing applications for two-bedroom homes, which would not be large enough for all the children. Even if they were approved for one, the father testified that he did not have enough money for a rental deposit. Both parents were employed, however, and earning enough money to cover their basic needs, according to the department's case manager.

In a thorough ruling, the juvenile court found clear and convincing evidence to terminate the parents' rights to their respective children under Iowa Code section 232.116(1)(f) and (h). The mother and father each appeal that ruling.

## II.   Analysis

"Termination proceedings are reviewed de novo." *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). In our review, we use a three-step analysis that asks whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory exception applies and

should be exercised to preclude termination. *Id.*; *see also* Iowa Code § 232.116(1)–(3). The mother and father challenge each step in this analysis in their separate appeals.

## A. Statutory Grounds

The parents only contest the common final element of Iowa Code section 232.116(1)(f) and (h),[4] both of which require clear and convincing evidence that the children cannot be returned to the custody of the child's parents at the present time. The juvenile court concluded the State met its burden of proof, finding:

> Despite numerous services and supports, [the parents] ha[ve] repeatedly demonstrated an inability to provide adequate supervision for their children. This has been evidence[d] repeatedly throughout the case during supervised interaction[s] which require multiple professionals in addition to the parents for the children's safety to be assured. [The parents] have demonstrated that they lack the parenting skills necessary to manage the children's significant needs. They have demonstrated an inability to provide the children with adequate shelter, as they have been offered every service possible to do so but have still refused to maintain the home in a safe and sanitary condition for young children. . . . [The father] has never acknowledged how his own mental health impacts his children, has never acknowledged the inappropriateness of his engagement with the children, and has never acknowledged the dangers that the condition of the home posed for young children. He has repeatedly placed upon [the mother] more responsibility for maintaining the household, supervising the children, and managing the children's needs than she could possibly shoulder given her own limitations. And [the mother], without [the father's] assistance, does not have the functional capacity to provide a reasonable degree of supervision on her own, nor to provide the children with adequate shelter.

---

[4] The differences between section 232.116(1)(f) and (h) involve the ages of the children at issue and the length of the period of removal. *See In re M.B.*, No. 19-1884, 2020 WL 569649, at *2 (Iowa Ct. App. Feb. 5, 2020).

We reach the same findings on our de novo review of the record. In doing so, we do not discount the positives highlighted by the mother's petition on appeal: she was employed, participating in mental health and other services, and attending visits with her children. But the record sadly shows that the mother could not adequately care for the children even with a great deal of support from the department. *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (affirming termination under section 232.116(1)(h) where "the record indicates that after a year of services, the parents were still not in a position to care for [their child] without ongoing [department] involvement"). We recognize "that a parent's 'lower mental functioning alone is not sufficient grounds for termination.'" *Id.* (citation omitted). It is, however, a relevant consideration where it affects the children's well-being, as it clearly does here. *Id.* As for the father's bare-bones argument that "no real safety issues existed for the children" in the home, report after report from providers documented those issues. Those reports, along with other evidence in the record, establish that the children could not be safely returned to their parents' custody at the time of the hearing despite the department's reasonable efforts.

## B. Best Interests

The parents next challenge whether it is in their children's best interests to terminate their parental rights. In considering this question, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). The defining elements of a child's best interests are safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

The juvenile court found that despite the parents' love for their children and the extensive services offered by the department,

> these children were not provided a safe home and adequate supervision to keep them safe. Further, these children's significant mental health, behavioral, educational, and developmental needs were not me[]t in their parents' care. . . . It does not appear the parents will be able to provide care for these children in the future, despite being offered all possible assistance.

The record supports these findings, which the parents do not meaningfully dispute on appeal. Instead, they each argue termination was not in the children's best interests because they are not placed together and some of their placements are not pre-adoptive.

The department tried to place the children together but was unable to find a home that could take them all and attend to their special needs. The three youngest children are in the same placement, and the two middle children have always been placed together. The oldest child was placed with the maternal grandmother before moving to a foster family. The case manager testified that the children had all formed healthy bonds with the caregivers in their respective homes, who intended to maintain the sibling relationships. While we prefer to keep siblings together, "this preference is not absolute." *In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006). "Our ultimate concern is the best interests of the child." *Id.*; *see also* Iowa Code § 232.108(1). We agree with the juvenile court that the children's interests were best served by terminating their parents' rights so that permanency can be established "in homes where their needs will be met and their safety ensured through proper supervision." *See In re H.H.*, 528 N.W.2d 675, 677 (Iowa

Ct. App. 1995) (finding termination was in the children's best interests even though their adoption was not guaranteed).

## C.    Permissive Exception

Both parents passively mention their bond with the children and cite to Iowa Code section 232.116(3)(c), which allows the court to avoid termination if there is "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."  Assuming without deciding that the parents' arguments on this issue are properly before us,[5] we agree with the juvenile court that neither parent carried their burden of proof on this issue.  *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) ("[T]he parent resisting termination bears the burden to establish an exception.").  While the father testified that the children love him and their mother, "love is not enough to trigger this exception."  *In re A.M.*, No. 20-0480, 2020 WL 4814170, at *4 (Iowa Ct. App. Aug. 19, 2020).  The record shows that the "disadvantages of termination do not overcome the safety concerns that would come with denying termination."  *Id.*

---

[5] We do not do the same for the father's argument that a "guardianship should be explored with the respective placement parents to allow the parents continued visitation and an opportunity to rectify the circumstances to the State's satisfaction."  Unlike the bond issue, which was briefly discussed at the termination hearing and rejected by the juvenile court in its ruling, the father never mentioned a guardianship at the hearing, and the court did not consider it.  As a result, "the issue is not preserved for appellate review."  *In re C.P.*, No. 20-0310, 2020 WL 2488228, at *3 (Iowa Ct. App. May 13, 2020); *see also Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (stating issues must be raised and decided by the district court before we will address them on appeal).

**III.     Conclusion**

We affirm the termination of the mother's parental rights to her six children and the termination of the father's parental rights to the five youngest children.

**AFFIRMED ON BOTH APPEALS.**